**LA CAISSE POPULAIRE STE–MARIE (ST. MARY'S BANK)**

v.

**The UNITED STATES of America.**

**Civ. A. No. 75–383.**

United States District Court,
D. New Hampshire.

Dec. 10, 1976.

E. Tupper Kinder, Jr., James E. Higgins, Sheehan, Phinney, Bass & Green, Manchester, N. H., for plaintiff.

Dennis M. Donohue, Jerome Fink, Dept. of Justice, Washington, D. C., for defendant.

## OPINION AND ORDER

BOWNES, District Judge.

This is an action to recover income taxes alleged to be erroneously and illegally assessed and collected by the Internal Revenue Service. The taxpayer claims that it is an exempt organization under Section 501(c)(14)(A) of the Internal Revenue Code. Jurisdiction is conferred on this court by 28 U.S.C. § 1346(a)(1). The issue is whether the plaintiff is a "credit union" within the meaning of Section 501(c)(14)(A) of the Internal Revenue Code.

## BACKGROUND

The taxpayer, La Caisse Populaire Ste-Marie (St. Mary's Bank),[1] was the first credit union organized in the country. Its charter from the State of New Hampshire on April 9, 1909, came just six days prior to the enactment of a general credit union statute in Massachusetts. New Hampshire did not pass a general credit union statute until 1921.

In 1935, the taxpayer requested that the Treasury Department exempt it from federal income taxation under Section 101 of the Revenue Act of 1934. The Treasury Department granted that exemption on October 5, 1935.

In 1951, Section 101(4) of the Internal Revenue Code, under which credit unions were held to be exempt, was revised. Prior to 1951, credit unions were allowed to claim an exempt status because of their similarity to building and loan associations and cooperative banks. 31 Op.A.G. 6.176 (1917). The Revenue Act of 1951 revoked the exemption of mutual savings banks and savings and loan associations, but, at the same time, exempted credit unions by name for the first time. 26 U.S.C. § 501(c)(14)(A). The words "credit union" are not defined in the Code.

In 1962, the Internal Revenue Service recommended to the Secretary that the taxpayer's exempt status be revoked because it was not being operated as a credit union. The exemption granted in 1935 was revoked in a letter dated January 14, 1966. The taxpayer paid taxes in the years 1969 through 1974 in the following amounts: $0, $4,616.70, $3,824.25, $4,724.16, $32,826.00, and $2,974.00, respectively. The taxpayer filed claims for refunds for the years in question which were disallowed. This action was commenced on December 23, 1975.

The Internal Revenue Service claims that St. Mary's was not operated as a credit union during the years in question and that it was not entitled to the exemption.

## SYNOPSIS OF FINANCIAL INSTITUTIONS

Since it is the Government's position that the plaintiff functions as a bank and not as a credit union, it is necessary to examine the history and structure of both the banking system and the credit union movement in this country and the pertinent Federal and State statutes.

### The Dual Regulatory System

The dual bank regulatory system with which we find ourselves today is a result of the holding in *McCulloch v. Maryland*, 4 Wheat (U.S.) 316, 4 L.Ed. 579 (1819), that Congress was able to charter banks under the authority of the "necessary and proper" clause of Article I and the historical regulation of banks by states, reserved to them as a police power under the Constitution. *Braeburn Security Corp. v. Smith*, 15 Ill.2d 55, 153 N.E.2d 806 (1958), *appeal dismissed*, 359 U.S. 311, 79 S.Ct. 876, 3 L.Ed.2d 831 (1959); *Farmers & M. Bank v. Federal Reserve Bank*, 262 U.S. 649, 43 S.Ct. 651, 67 L.Ed. 1157 (1923); *Engel v. O'Malley*, 219 U.S. 128, 31 S.Ct. 190, 55 L.Ed. 128 (1911); *Noble State Bank v. Haskell*, 219 U.S. 104, 31 S.Ct. 186, 55 L.Ed. 112 (1911); *Opinion of Justices*, 102 N.H. 106, 151 A.2d 236 (1959). Other cases which have upheld the Federal Government's constitutional authority to charter financial institutions include: *First National Bank v. Walker Bank & Trust Co.*, 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966); *Franklin National Bank v. New York*, 347 U.S. 373, 74 S.Ct. 550, 98 L.Ed. 767 (1954); *Texas & P. R. Co. v. Pottorff*, 291 U.S. 245, 54 S.Ct. 416, 78 L.Ed. 777 (1934); *Smith v. Kansas City Title & T. Co.*, 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577 (1921); *First National Bank v. Fellows*, 244 U.S. 416, 37 S.Ct. 734, 61 L.Ed. 1233 (1917); *Osborn v. Bank of United States*, 9 Wheat (U.S.) 738, 6 L.Ed. 204 (1824).

■ As a result, both Congress and the states may charter a variety of financial institutions. Today there are three types of federally chartered financial institutions:

---

1. St. Mary's Bank is a rough translation of the French name and will be used hereinafter.

national associations, federal savings and loan associations, and federal credit unions.

## National Banks

■ National associations, or national banks, are primarily commercial banks. They have the option of becoming members of the Federal Reserve, in which case they will be supervised by the Federal Reserve. All national banks are subject to the rules of the Comptroller of the Currency, an official of the Treasury Department, and all must have their deposits insured by the Federal Deposit Insurance Corporation. *See generally* 12 U.S.C., chs. 1, 2, 3, & 16.

Varying amounts, depending upon the size of the locality in which the bank proposes to operate, are required to be contributed to the association in return for capital stock. 12 U.S.C. § 51. National banks are permitted to form branches pursuant to state law. 12 U.S.C. § 36. Apart from the reserve requirements of the respective bank regulatory agency, national banks are permitted to make loans or investments for all of the purposes permitted to any financial institution. Traditionally, national banks, like all commercial banks, have favored short-term business loans, although they are permitted and do maintain a smaller percentage of their assets in consumer loans, real estate loans, and others.

The other noteworthy feature about national banks, and other commercial banks, is that they are permitted to accept both demand deposits and time deposits. Demand deposits are deposits of funds which are payable on demand. Time deposits cannot legally be required to be paid until a certain time or day or a certain number of days after the deposit is made. In addition to these two kinds of deposits, a third, certificates of deposit, are time deposits for longer periods of time, usually yielding higher rates of interest. Most checking accounts are demand deposits.[2] Savings accounts are always time deposits.[3] There is also a general prohibition on the payment of interest on demand deposits.

## Federal Savings and Loan Associations

■ The Federal Home Loan Bank Board was established in 1932 by the Federal Home Loan Bank Act. 12 U.S.C. § 1421 *et seq.* In 1933, it was given the authority to charter and supervise federal savings and loan associations. 12 U.S.C. § 1464 *et seq.* Savings and loan associations, in contrast with national banks and other commercial banks, were formed by Congress:

> In order to provide local mutual thrift institutions in which people may invest their funds and in order to provide for the financing of homes . . . . 12 U.S.C. § 1464(a).

Savings and loan associations still keep the great bulk of their assets in home mortgages. 12 U.S.C. § 1464(c). As mutual associations, they do not raise money through the sale of capital stock, but only through the solicitation of deposits. 12 U.S.C. § 1464(b)(1) and 12 C.F.R. § 543.3. The earned surplus technically belongs to the depositors, but, because dividend rates are restricted, they only receive them in regulated amounts unless the association is liquidated. The depositor-owners do not have any control over the management of the institution which is run by a self-perpetuating board of directors. 12 C.F.R. § 543.6. Except in New Hampshire and Massachusetts, where N.O.W. accounts are permitted:

> accounts in a Federal association shall not be subject to check or to withdrawal or transfer on negotiable or transferable order or authorization to the association. 12 C.F.R. § 545.4–1(a)(1).

The Federal Savings and Loan Insurance Corporation insures all federal savings and loan associations.

---

2. Negotiable Orders of Withdrawal (N.O.W. Accounts), permissible in New Hampshire and Massachusetts, while technically time deposits operate as checking accounts; they also pay interest 12 C.F.R. § 545.4–1(a)(3).

3. Even though most banks pay money out of savings accounts on demand, they are required to reserve the right to withhold the money for a period of time.

*Federal Credit Unions*

■ 1934 was a fertile year for the creation of new financial institutions. Not only did Congress create federal savings and loan associations, but it also passed the Federal Credit Union Act. Federal credit unions are now regulated by the National Credit Union Administration which also insures many state chartered credit unions. One principal difference between credit unions and other federally chartered financial institutions lies in the democratic control and management of credit unions. Although savings and loan associations are also mutual associations, depositors do not have any say in the election of the directors who compose a self-perpetuating board. 12 U.S.C. §§ 1760 & 1761 mandate democratic control of all federal credit unions.[4]

> No member shall be entitled to vote by proxy, but a member other than a natural person may vote through an agent designated for the purpose. Irrespective of the number of shares held by him, no member shall have more than one vote. 12 U.S.C. § 1760.

Federal credit unions are not subject to taxation under the Internal Revenue Code. 26 U.S.C. § 501(c)(1) and 12 U.S.C. § 1768. 12 U.S.C. § 1759 requires that:

> Federal credit union membership shall be limited to groups having a common bond of occupation or association, or to groups within a well-defined neighborhood, community, or rural district.

The common bond requirement, together with the statutes which specify democratic control, are what most set federal credit unions apart from federal savings and loan associations.

The Federal Credit Union Act limits the loans which can be made and the assets which can be held by an institution chartered under its auspices. The most important limitation is that a credit union may only make loans to its members. Congress has also strictly limited the authority of credit unions to make long-term, real estate, and other loans. 12 U.S.C. § 1757.

Federal credit unions are limited to receiving deposits on shares from their members by the same statute. 12 U.S.C. § 1757(7). Federal credit unions are generally not permitted to offer checking accounts, although it would seem that they might be permitted to offer some sort of third-party payment device in some instances. 12 C.F.R. §§ 701.22 & 23 and 721.3. *See also* 12 U.S.C. § 1781(c)(3) which provides for the insurance of checking accounts in state chartered credit unions.

Perhaps the most important distinction to the members of a federal credit union is that they not only receive their regular interest payments, but they may also receive a share of surplus. 12 U.S.C. § 1763. This is, of course, subject to the credit union's maintenance of adequate reserves and other requirements imposed by the National Credit Union Administration.

### State Chartered Institutions

Title XXXV of the New Hampshire Revised Statutes Annotated provides for the chartering of trust companies, guarantee savings banks, mutual savings banks, building and loan associations, and credit unions.

*Commercial Banks*

■ NH RSA 392 provides for the organization of "trust companies" which are New Hampshire's commercial banks. For the sake of brevity, I will not delineate each of the aspects of "trust companies." Suffice it to say that in corporate organization (capital stock), lending authority and policy, and general investment authority and policy, they are much the same as national banks. They also have similar authority with regard to the receipt of deposits and parallel authority with regard to branching and payment of interest on deposits. The most important distinctions between "trust companies" and national banks lie in the nature of their respective regulators, examiners,

---

4. 12 U.S.C. § 1758 and 12 C.F.R. § 701.14(e) and (f) call for bylaws which also protect the democratic nature of credit unions.

and reserve requirements. "Trust companies" are also eligible for insurance by the Federal Deposit Insurance Corporation and membership in the Federal Reserve.

### Savings Banks

New Hampshire statutes provide for two types of savings banks. Mutual savings banks are found in seventeen east coast states as well as New Hampshire. NH RSA 386:9 & 10. Guarantee savings banks are a hybrid institution indigenous to this state. NH RSA 386:12 *et seq.*, as amended. Mutual savings banks are owned by their depositors and run by a self-perpetuating board of directors similarly to federal savings and loan associations. Guarantee savings banks are owned by stockholders who elect boards of directors which are responsible for the management of the day-to-day operations of the institutions. NH RSA 386:12–386:16.

Savings banks are designed primarily to make real estate loans, but they are also permitted to maintain a portfolio consisting of a large variety of other conservative investments. NH RSA 387:4; NH RSA 387:5–387:27.

The deposit authority of savings banks, which must be insured by the F.D.I.C., is similar to that of federal savings and loan associations. NH RSA 386–A:19–a *et seq.* They have historically been denied checking account authority, but have recently been permitted to offer N.O.W. accounts.

### Building and Loan Associations

■ Building and loan associations, which may also call themselves "co-operative banks" or "savings and loan associations," NH RSA 393:3, are organized very similarly to federal credit unions in that they are democratically controlled mutual institutions. NH RSA 393:11. In this, they are also similar to state chartered credit unions. NH RSA 394:6–394:11. Building and loan associations are similar to savings banks, both "mutual" and "guarantee," in that they are primarily restricted to real estate lending. NH RSA 393:15. Their nonreal estate loans are more greatly restricted than those of savings banks. NH RSA 393:15–a & 393:15–b.[5] Their real estate loans are also closely regulated. NH RSA 393:18. The deposit structure is similar to those of federal savings and loan associations.

### State Chartered Credit Unions

■ There are two principal distinctions between credit unions and building and loan associations. The first lies in their loan authority. Credit unions are granted wider authority to make diverse loans. NH RSA 394:16 provides that credit unions:

> May make loans to its members on such terms and upon such security, real or personal, as the union may vote or its by-laws prescribe.

This service is performed principally by a "Credit Committee" which is unlike anything in the building and loan statute. NH RSA 394:32.

The second major difference is the State's parallel to the federal requirement of "common bond." NH RSA 394:5 provides:

> The by-laws shall prescribe . . . the conditions of residence or occupation which qualify persons for membership . . . . .

There are no cases or available legislative history to help interpret this requirement, and there was little testimony about the requirement for a "common bond" in New Hampshire State chartered credit unions.

### Credit Unions Historically

In 1850, Herman Schulze-Delitzsch, after being removed from his position as a Justice of the Peace in Delitzsch, Prussia, in 1849 as a result of radical political beliefs, formed a "co-operative purchasing society for master shoemakers to buy leather at wholesale prices."[6] He also formed a sepa-

---

5. *But see also* NH RSA 393:27.

6. J. Carrol Moody and Gilbert C. Fite, *The Credit Union Movement Origins and Develop-*

rate "cooperative credit society" to meet "the great need for credit among craftsmen and small shopkeepers." [7] The loans granted by Schulze-Delitzsch type credit unions were to be for "productive purposes." They were to be made to an artisan or merchant so that he could obtain the necessary materials to make a profit. These first credit unions were democratic in nature, run by the members on a one person, one vote basis. There was no requirement of common bond. Rather, the loans, which were always unsecured, were made on the basis of character "to all 'worthy seekers after credit, not limited to any one occupation, or social class . . . .' " [8] Unlike financial institutions today, these credit unions operated on the "unlimited liability" of their members.

Friedrick Wilhelm Raiffeisen, former mayor of Heddesdorf, created the first agricultural credit union in 1864.[9] The Heddesdorf credit union was organized with nominal capital subscriptions from its original membership and, like the Schulze-Delitzsch credit unions, borrowed on the "unlimited liability" of the members. These agrarian credit unions were not open to anyone; only owners of "tangible assets [real property]" were permitted to join.[10]

Raiffeisen also created central credit unions such as Rhein Agricultural Union Bank, his first, established in 1872, and the Central Agricultural Loan Bank, established in 1876 to be the single central credit union for all agricultural credit unions.[11] In 1913, there were 25,576 rural cooperative societies and, in 1915, 1,559 urban cooperative societies in Germany.[12]

In 1866, Luigi Luzzatti, a professor at the University of Padua, opened a cooperative bank in Milan.[13] Luzzatti rejected the principle of unlimited liability and the Schulze-Delitzsch dependence on high-priced shares.[14] Officers served without pay, and Schulze-Delitzsch's principle of "character credit" was employed.[15] By 1909, People's Bank of Milan was one of the largest banking institutions in Italy, with seventy unpaid officers and one hundred salaried clerks. It had almost 25,000 members, capital of nearly $2,000,000, and savings of over $32,000,000.[16] Rural credit unions, similar to those organized by Raiffeisen, were also established in Italy.

The credit union movement finds its North American roots in La Caisse Populaire de Levis located across the St. Lawrence River from the City of Quebec. A stenographer-reporter from the Provencial House of Commons, Alphonse Desjardins, organized the credit union at Levis in 1900. He determined that the dichotomy between urban and rural credit unions prevalent in Europe at the time should not prevail in Canada.[17] In rejecting the principle of "unlimited liability," he said:

> "Our population is completely opposed to the idea of unlimited responsibility," and that he would never have been able to acquire supporters if . . . [he] tried to have this principle accepted.[18]

By May, 1901, La Caisse Populaire had 840 members who owned 2,750 shares with outstanding loans of $8,000.[19] Any urban or rural resident of Levis had only to pay $5.00 to become a member of the institution which "always [gave] preference to smaller loans," and which allowed one vote per

ment, 1850–1970 (Exhibit 44), University of Nebraska Press, Lincoln, 1971, p. 4.

7. *Id.* at 5.

8. *Id.* at 6.

9. *Id.* at 11.

10. *Id.* at 11–12.

11. *Id.* at 12.

12. *Id.* at 13.

13. *Id.*

14. *Id.*

15. *Id.*

16. *Id.* at 14.

17. *Id.* at 21.

18. *Id.*

19. *Id.* at 22.

member regardless of the number of shares owned.[20]

In reality, however, the executive decisions of the association were made by the council of administration, which consisted of nine shareholders elected by the general meeting of the shareholders.[21]

\* \* \* \* \* \*

Interest on loans was fixed by the committee on administration, which took into account the general state of the money market, the rate being charged by banks, and the "legitimate remuneration to the thrifty who provide the funds." [22]

Interest paid was about 8%.[23] By 1914, there were one hundred forty cooperative banks in Canada.[24]

St. Mary's Cooperative Credit Association was established on November 24, 1908, by Monsignor Pierre Hevey, Pastor of St. Mary's Church on the west bank of the Merrimack River in Manchester.[25] The "West Side" then, as now, was occupied predominantly by French speaking Canadian immigrants and their decendants who had come to work in the Amoskeag Mills, one of the world's largest textile mills. With the assistance of Alphonse Desjardins, organizer of La Caisse Populaire de Levis, the Monsignor organized this country's first credit union which was incorporated less than one year later, on April 6, 1909, by an Act of the State Legislature. Chapter 303 of the Laws of 1909 define the authority of the corporation to accept deposits from and give loans to its members exclusively. Membership was initially restricted to residents of Manchester, but this provision was removed from St. Mary's charter in 1925. In 1917, the name of the institution was changed to La Caisse Populaire Ste. Marie to which the Legislature added the anglicized name "St. Mary's Bank," in 1925. At the same time, the residential membership

requirement was eliminated. St. Mary's charged $5.00 for the purchase of one share and limited the total ownership of shares by one individual to one hundred shares. These provisions still remain. St. Mary's charter called for it to be taxed by the State as if it were a savings bank. This provision was never deleted, despite the fact that the general credit union statute of 1921 which originally called for a similar tax on institutions chartered under its authority was subsequently amended to eliminate that requirement.

At the same time as Monsignor Hevey was organizing his credit union, Edward Filene, a Boston merchant, was busy establishing a system of credit unions which was to become the nucleus of this country's credit union movement. By July, 1974, there were 23,028 state and federal credit unions with 28,700,000 members.[26]

### ANALYSIS

St. Mary's claims exempt status under 26 U.S.C. § 501(a) and (c)(14)(A) which provide:

(a). An organization described in subsection (c) . . . shall be exempt from taxation under this subtitle

. . . . .

\* \* \* \* \* \*

(c). The following organizations are referred to in subsection (a):

\* \* \* \* \* \*

(14)(A). Credit unions without capital stock organized and operated for mutual purposes and without profit.

In *United States v. Cambridge Loan and Building Company*, 278 U.S. 55, 49 S.Ct. 39, 73 L.Ed. 180 (1928), the Court was faced with Cambridge Loan and Building Company's claim that it qualified as a "domestic building and loan association" under the

---

**20.** *Id.*

**21.** *Id.* at 22.

**22.** *Id.* at 23.

**23.** *Id.*

**24.** *Id.*

**25.** The history of St. Mary's comes from Moody's book and from Hebert's testimony.

**26.** NCUA Quarterly, Summer, 1974 (Exhibit 14), p. 94.

predecessor statute to Section 501(c)(14). In that case, the circumstances of which are much the same as here, Justice Holmes stated:

> The statutes speak of 'domestic' associations, that is, associations sanctioned by the several States. They must be taken to accept with the qualifications expressly stated what the States are content to recognize, unless there is a gross misuse of the name. *Id.* at 59, 49 S.Ct. at 40.

This case has been continuously followed. *See*, for example, *Burnet v. Harmel*, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199 (1932); *Bowers, Executor v. Lawyers Mortgage Company*, 285 U.S. 182, 52 S.Ct. 350, 76 L.Ed. 690 (1932); *Commissioner of Internal Revenue v. Union Mutual Insurance Company of Providence*, 386 F.2d 974 (1st Cir. 1967); *Mutual Insurance Company of Germantown v. United States*, 142 F.2d 344 (3d Cir. 1944); *Farmers Union Co-op Co. v. Commissioner*, 90 F.2d 488 (8th Cir. 1937). Although the statute, which now expressly exempts "credit unions" and no longer exempts "building and loan associations," has been amended and the word "domestic" left out, the new statute clearly applies to state credit unions. Federal credit unions are exempted separately under Section 501(c)(1).

■ The Government has suggested that St. Mary's is no longer considered a credit union by the State. It points to its separate listing in the Bank Commissioner's Annual Reports (Exhibit 25). The Bank Commissioner explained that St. Mary's size and greater depository and lending authorizations do not permit it to be compiled in the same tables as other credit unions. This explanation seems perfectly reasonable.

The Government contends that St. Mary's taxation as a savings bank is further evidence that St. Mary's is not considered a credit union by the State, but this form of taxation is consistent with the treatment of credit unions in some other states.[27] It is also consistent with the tax treatment given to credit unions organized prior to 1929 under the predecessor to NH RSA 394.

The Government also points to *Manchester Federal Savings and Loan Association v. State Tax Commission*, 105 N.H. 17, 20–21, 191 A.2d 529 (1963), as further grounds for its position. Suffice it to say that St. Mary's was not a party to that case and the Court's observation was pure dicta.

The plaintiff's organization under its charter is the same as the organization of credit unions under NH RSA in that: (a) both are under the control and supervision of the Bank Commissioner; (b) both have identical requirements for bylaws; (c) both require annual meetings; (d) both require that management is by board of directors, a credit committee and a supervisory committee; (e) both require a guaranty fund to be established before the payment of annual or semi-annual dividends and require that 15% of annual earnings be contributed to the guaranty fund; (f) both require that a member must be a shareholder; (g) both provide for limitation of the number of shares that may be held by a member; and (h) both require democratic control by limiting each member to one vote.

The historical reason for St. Mary's individual charter and the testimony of the State's Bank Commissioner that St. Mary's is regulated as a credit union convince this court that the State considers the plaintiff to be a credit union.

Therefore, we are left with the two-prong test of *Cambridge, supra*. First, does St. Mary's meet the "qualifications expressly stated"? Second, is the State's recognition of St. Mary's as a "credit union," "a gross misuse of the name"?

■ St. Mary's clearly meets the "stated qualifications" for a credit union which are, "without capital stock organized and operated for mutual purposes and without profit." 26 U.S.C. § 501(c)(14)(A). To this requirement, the regulations add nothing.

> Credit unions . . . without capital stock, organized and operated for mutual purposes and without profit, are exempt from tax under section 501(a) [the section

27. Minn.Stat. § 52.23, Tenn.Code Ann. § 45–1830.

exempting certain organizations]. 26 C.F.R. § 1.501(c)(14)–1.

St. Mary's is structurally the same as every other credit union which we have examined by statute or which has been discussed by any witness. There is no "capital stock." The shares owned by the members cannot appreciate in value. The cost of a share is $5.00 which is the same as it was when St. Mary's was established. Because St. Mary's will buy back any share for $5.00, there can be no gain or loss. This is the same structure which was initially approved as being "without capital stock" so that credit unions could be exempted under the general exemption for co-operative institutions. 31 Op.A.G. 176 (1917).

■ St. Mary's is operated for "mutual purposes" within the meaning of the Code. Both borrowers and savers alike are required to be members of the institution and participate in the earnings of the institution by receiving dividends declared on capital shares. The members are the only owners.

■ St. Mary's is operated "without profit." The earnings are turned over to the members annually or invested on their behalf. The plaintiff is a nonprofit institution because all the earnings of the institution, after the deduction from net earnings of necessary and prudent reserves, are distributed to the members, borrowers and savers alike, or held for the benefit of all members in a surplus account for the purpose of dealing with future contingencies.

The particular distinction between profit and nonprofit institutions is one which exists only as a result of the tax law; however, artificial distinctions are not strangers to the tax law but rather seem to pervade it. For instance, there is scant difference between a "partnership" and a "professional association." The *vera causa* for a "professional association" is tax treatment, and the only distinction between it and a "partnership" is "centralized management." Tax benefits are not the only reason for the

structural difference between credit unions and other financial institutions. As is the case with St. Mary's credit unions are truly organized for mutual purposes and are democratically controlled.

■ The second question is whether New Hampshire has "gross[ly] misused" the name "credit union." I find that it has not.

St. Mary's is truly cooperative in that each member is entitled to one vote regardless of the number of shares he owns. This democratic control is not destroyed by the permitted use of proxy voting. No evidence has been submitted on the practices of other large credit unions,[28] but the fact that St. Mary's is the only credit union permitted the use of proxies by State law at its annual meeting is hardly surprising given the size of its membership.

The plaintiff's bylaws provide that, to become a member, a person must be a shareholder. (Bylaws, Art. IV.) To become a member in the plaintiff institution, one must apply for membership, sign a signature card, agree to abide by the bylaws and pay $5.00 per share for at least one and not more than one hundred shares of the plaintiff's capital shares. Although the plaintiff's charter has no written limitation on membership (*but see* Bylaws, Art. IV), in fact, the plaintiff primarily serves members of French-Canadian background in Manchester and the surrounding area. Over 80% of the plaintiff's members were of French-Canadian extraction during the tax years 1969 through 1974, and over 90% came from Manchester and contiguous towns.

■ The Government has suggested, and its expert stated, that a credit union must strictly adhere to a principle of common bond. The Federal Act requires a very strict adherence to a common element as does the general State law. Nowhere does the tax law call for any element of common bond at all, let alone a strict adherence to it. A common bond, or limitation of mem-

28. Credit unions organized under the Credit Union Laws of the States of New York and Ohio are authorized to have proxy voting

*(McKinney's Consolidated New York Laws, Banking Law*, § 464 (by amendment in 1975); *Page's Ohio Rev.Code Ann.* § 1733.13).

bership, need not be written into the charter of an institution in order for it to be a credit union under the tax law, but need only exist as a matter of practice.[29] Certainly, the common bond of a credit union can be determined from its membership. The facts show that the members of St. Mary's do have a common bond, even though it is not spelled out in so many words.

The location of St. Mary's ensures for its members, far better than any written requirement could, a common bond of Franco-American ancestry and a geographic tie to Manchester. St. Mary's Bank is still located in the shadow of the spires of St. Mary's Church, not two blocks from its original site. The membership of St. Mary's is primarily of French-Canadian descent. Its tellers are bilingual and its only office is on the "West-Side" of Manchester where the population is almost exclusively of Franco-American background, and where few outside Manchester and environs are likely to join. The Bank Commissioner testified that the community served by St. Mary's is sufficiently homogeneous to comprise a common bond for a neighborhood type credit union and that the existence of an occasional outsider would in no way shatter the existence of the requisite common element. Even without written requirements, St. Mary's continues to serve a distinct Franco-American community, the inhabitants of which form the nucleus and the majority of St. Mary's membership.

Many differences between the powers of St. Mary's and those of other credit unions are urged by the Government as a basis for finding that St. Mary's, the first credit union in the country, is no longer a credit union at all. None of these powers is prohibited under the tax laws. The suggestion also implies that a state could not have two classes of credit unions, one class chartered with limited powers and another class chartered with greater powers. In fact, there is no limitation placed on the chartering of separate classes of credit unions. In New Hampshire, there are two classes: St. Mary's and the other credit unions. This is not unreasonable in light of St. Mary's size and longevity.

It may well be that it is unfair to the other Manchester financial institutions to allow St. Mary's to compete with them with the extra advantage of a tax exemption. What we are concerned with here, however, is the law as it is; it is not for this court to rewrite the tax or banking laws of either the State or the nation. Moreover, there are still many individuals on the West Side of Manchester who, were it not for St. Mary's, might well have to resort to the usurious money lenders that credit unions were designed to combat.

The Government seeks to have this court overrule the findings of the State Banking Commissioner by defining new tests for determining when an institution is a credit union, although neither the Congress, through legislation, nor the Internal Revenue Service, through rule making, has seen fit to do so. Banking and money lending have long been regulated and controlled by the legislative process. If the law needs redefining and rewriting, that is a task for the Congress, not the courts.

THEREFORE I FIND AND RULE:

1. The recognition of the plaintiff as a credit union by the State of New Hampshire is not a gross misuse of the name.

2. Plaintiff was a credit union within the meaning of Section 501(c)(14)(A) of the Internal Revenue Code during the tax years 1969–1974.

3. Plaintiff's rental income for the tax years in question is not unrelated business income under Section 501(b) of the Internal Revenue Code, the income being rental income from nondebt financed real property. 26 U.S.C. §§ 501(b), 514(f), and 514(g); 26 C.F.R. §§ 1.512(b)(3)(A)(i), 1.512(b)–1(c)(2)(ii)(a), and 1.514(b)–1a).

All exhibits marked for identification at the trial are admitted into evidence.

**29.** I do not decide whether an institution with no common bond can still be a credit union within the meaning of 26 U.S.C. § 501(c)(14)(A).

Judgment is entered for the plaintiff in an amount equal to the amount of taxes paid for the years 1969 through 1974, forty-eight thousand nine hundred sixty-five and 11/100 dollars ($48,965.11), plus interest.

SO ORDERED.