**The CHESHIRE NATIONAL BANK and Connecticut River National Bank**

v.

**James E. SMITH, Comptroller of the Currency of the United States.**

**Civ. A. No. 76–94.**

United States District Court,
D. New Hampshire.

Feb. 22, 1977.

---

Arnold R. Falk, Bell & Falk, Keene, N. H., for plaintiffs.

Edward Jiran, Washington, D. C., for defendant.

## OPINION AND ORDER

BOWNES, District Judge.

The plaintiffs, Cheshire National Bank of Keene and Connecticut River National Bank of Charlestown, seek to overturn the Comptroller's approval of an application by the Keene National Bank (Keene) of Keene to relocate its Walpole, New Hampshire, agency from Westminster Street to Main Street. They also challenge an alleged approval by the Comptroller of an expansion of services by Keene.

The issue is whether the Comptroller was correct in finding that Keene's agency in Walpole is a branch and that it qualified under the "grandfather clause" of 12 U.S.C. § 36(a) (The McFadden Act).

## STANDARD OF REVIEW

■ Purely legal issues are decided *de novo* by this court, but factual determinations made by the Comptroller can be overturned only if they are without rational basis. If the Comptroller committed no procedural errors which would call for a remand, and if he did not act arbitrarily or capriciously, his decision cannot be overturned. *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *City National Bank v. Smith,* 168 U.S.App.D.C. 221, 513 F.2d 479 (1975); *First National Bank of Fayetteville v. Smith,* 508 F.2d 1371 (8th Cir. 1974); *Seattle Trust and Savings Bank v. Bank of California, N.A.,* 492 F.2d 48, cert. den., 419 U.S. 844, 95 S.Ct. 77, 42 L.Ed.2d 72 (2 Cir., 1974); *Sterling National Bank of Davie v. Camp,* 431 F.2d 514, cert. den., 401 U.S. 925, 91 S.Ct. 879, 27 L.Ed.2d 829 (5 Cir., 1970).

## THE FACTS

Keene was chartered as a national association in 1865 and has continuously conducted banking business in Keene ever since. Despite the fact that national associations were permitted to have offices in only one location, Keene's Board of Directors authorized one Josiah G. Bellows to hold $500 in Walpole for the purpose of cashing checks, making loans, discounting notes, and accepting loan payments on January 16, 1872. From that time, with the possible exception of a few months in 1927, Keene employed an agent in Walpole in a similar capacity. From 1898 until May of 1975, this business was conducted at the offices of the Savings Bank of Walpole (Walpole) by an employee paid in part by Walpole and in part by Keene.

Until recently, savings banks in New Hampshire could not offer demand deposit accounts (checking accounts) to their customers while commercial banks, including

national associations, could.[1] The arrangement between Keene and Walpole gave the customers of Keene an opportunity to do business with that institution without travelling the seventeen miles from Walpole to Keene and allowed the customers of Walpole to have checking accounts conveniently serviced in the same office as was the rest of their business. This mutual convenience provided the basis for a very comfortable relationship between the two banks until 1974 when savings banks in New Hampshire and Massachusetts were granted authority to offer demand deposit accounts called Negotiable Order of Withdrawal (NOW) accounts.[2] The practice of having one bank's employee serve as the agent for another bank may have been unique to this situation, but it is common in New Hampshire to find a savings bank and a commercial bank sharing the same lobby for the convenience of their customers and their own mutual profit. This practice is diminishing as the different institutions encroach increasingly on each other's terrain.

With the advent of NOW accounts in the early 1970's and their express legalization in 1974, Walpole was able to duplicate the checking services offered by Keene. Not surprisingly, Walpole evicted Keene from its premises in May of 1975. By letter of May 16, 1975, Keene notified the Comptroller that it was about to be evicted from Walpole's premises and requested permission to relocate. The Comptroller, by letter dated May 21, 1975, granted Keene temporary permission to relocate pending "the full administrative consideration . . . provided by 12 C.F.R. Part 5 . . . ."

## STATUTORY REQUIREMENTS

The statutory requirements for national banking associations to maintain a branch or branches are at 12 U.S.C. § 36, the codification of the McFadden Act, which states in pertinent part:

The conditions upon which a national banking association may retain or establish and operate a branch or branches are the following:

(a) A national banking association may retain and operate such branch or branches as it may have had in lawful operation at the date of the approval of this Act [Feb. 25, 1927], and any national banking association which continuously maintained and operated not more than one branch for a period of more than twenty-five years immediately preceding the approval of this Act [Feb. 25, 1927] may continue to maintain and operate such branch.

\* \* \* \* \* \*

(e) No branch of any national banking association shall be established or moved from one location to another without first obtaining the consent and approval of the Comptroller of the Currency.

(f) The term "branch" as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or any branch place of business located in any State or Territory of the United States or in the District of Columbia at which deposits are received, or checks paid, or money lent. 12 U.S.C. §§ 36(a), (e) & (f).

The McFadden Act was passed in 1927, according to its chief sponsor, Congressman McFadden, "to restore as nearly as possible the equilibrium between state and national banks within the Federal Reserve System." Cong. Rec., June 7, 1924, p. 1296ff. Prior to the enactment of this law, several states allowed branch banking for state chartered institutions. National banks, in order to compete in those jurisdictions, were converting from their federal charters to state charters. The McFadden Act allowed national banks to establish branch offices in

---

1. For a discussion of how NOW accounts and other modern developments blur the distinctions between financial institutions *see La Caisse Populaire Ste.-Marie (St. Mary's Bank) v. The United States of America*, 425 F.Supp. 512 (D.N.H. 1976).

2. NOW accounts were actually first offered by savings banks in Worcester, Massachusetts, and Concord, New Hampshire, without authority. This practice grew in the two states before Congress took affirmative action to confine its limits to New Hampshire and Massachusetts.

jurisdictions which permitted it for their own institutions under the same terms and conditions. In the *First National Bank of Logan v. Walker Bank and Trust Co.,* 385 U.S. 252, 261, 87 S.Ct. 492, 497, 17 L.Ed.2d 343 (1966), the Court reviewed the history of federal branch banking law and concluded "that Congress intended to place national and state banks on a basis of 'competitive equality' insofar as branch banking was concerned."

## ANALYSIS

*The Grandfather Clause*

■ One of the requirements of 12 U.S.C. § 36(a) is that a branch to be maintained under the grandfather clause, must have been "continuously . . . operated . . . for a period of more than twenty-five years immediately preceding . . ." February 25, 1927. Another requirement is that the institution wishing to maintain a branch under this authority can have only one branch that qualifies. 12 U.S.C. § 36(a). The Comptroller found that both of these conditions were satisfied. The plaintiffs dispute his findings. This first issue is clearly one of fact, and the Comptroller must be sustained if there is any rational basis for his conclusion.

All parties agree that Keene's agent in Walpole was in continuous operation from 1876 to the present time except for the possibility of a brief interruption in 1927. Plaintiffs allege that correspondence and excerpts from national bank examination reports released by the Comptroller pursuant to Freedom of Information Act requests were not considered in reaching the Comptroller's conclusion and that these documents reveal that there were two outpost agencies, not one, and that they both ceased to exist on or about January 17, 1927, although the agency in Walpole was reestablished shortly thereafter.

A letter dated March 17, 1906, from W. B. Ridgely, Comptroller, to G. A. Litchfield, President of Keene, mentions two agencies, one in Hinsdale and one in Walpole. In his letter, the Comptroller said: "As it is unlawful for a national bank to receive deposits elsewhere than at its banking house, an explanation of this matter is requested." A letter from Keene's Board of Directors to the Comptroller, dated January 21, 1924, states that the practice of making loans at the agencies was discontinued. The examiner's report of November 1, 1925, suggests that this was not the case:

The Hinsdale N. H. agency receives deposits and cashes checks only, while the Walpole N. H. agency receives deposits, cashes checks and makes loans. . . .

This situation has been repeatedly criticized in the past by Chief Examiner Bean and brought to the attention of the Comptroller's Office.

The bank examination report of September 14, 1926, again calls into question the activities of Keene's two agencies:

Cashier Mason stated that several years ago he went to Washington and took up this matter with the Comptroller and was advised that the department would not object to this bank maintaining these agencies as they are now conducted. It is respectfully requested that your examiner be adives [sic] if the above agencies are legal.

The Deputy Comptroller responded to this request by the bank examiner with a letter to Keene's Board of Directors dated October 25, 1926. The letter states that the agencies are illegal and demands a response from the Board of Directors with an indication of what action has been taken. A copy was sent to the examiner.

On October 30, 1926, Daniel F. Murphy wrote a note to the Deputy Comptroller stating that he had been informed by the cashier in Keene that he was incorrect with regard to the acceptance of renewals.

On January 5, 1927, the Deputy Comptroller sent a note to the Directors of Keene reminding them of his October 25 request and asking what action had been taken towards discontinuation of the agencies. The reply, dated January 17, 1927, from Keene's Directors to the Comptroller states:

Replying to your favor of January 5th with regard to our arrangements to take

care of business in Hinsdale and Walpole (referred to in your letter as 'agencies'), we beg to advise that the practices to which the examiner raised objections have been discontinued.

It is on this statement that plaintiffs base their argument that the agencies had been discontinued. The plaintiffs also contend that the Comptroller did not consider the documents discussed above. That he did consider them is clear from reading footnote 5 of his decision:

The legality of Keene National Bank's Walpole operation was questioned at various times through the 25 years prior to February 25, 1927, by national bank examiners. The bank's examination reports for that period indicate that both the Chief Examiner and the Comptroller's Office were aware of the matter. Keene National Bank's directors, however, were convinced that as long as new loans or loan renewals were not made (approved) in Walpole, the bank was within the law. On October 26, 1926, the Deputy Comptroller, E. W. Stearns, sent a letter to the Board of Directors of the bank which directed them to discontinue the Walpole operation. By this time, the bank directors apparently were aware that the McFadden Act provided that even branches considered to be "illegally operated" would be grandfathered as long as the branch was in operation continuously for 25 years prior to February 25, 1927. The bank succeeded in delaying action by the Comptroller's Office to close the Walpole office and the office in Walpole was not discontinued prior to February 25, 1927. The "illegal" operation thereby became a legal branch grandfathered by Congress.

The Comptroller's conclusion that action to discontinue the agencies had been stalled by Keene's Directors pending final congressional action on the McFadden Act, drawn, as it must be, from the documentary evidence supplemented by the testimony of Keene's officers, meets the rational basis standard of review. That Keene's Board of Directors would not abandon their pursuit of a branch in Walpole with the passage of the McFadden Act so readily in sight is quite clear from the recital of their stalling action above.

*Were the Agencies Branches?*

■ The second issue is whether the agency at Walpole constituted a branch. The precise practice of Keene's agent in Walpole, which is important in determining whether the Walpole institution operated as a branch, are set out in Keene's Exhibit A to the Comptroller's hearing, a 1954 letter to the Chief National Bank Examiner. Record at 233–234. It says that there was no sign posted which indicated the existence of the agency, but that the agent kept deposit slips at Walpole. Customers of Keene could make deposits at Walpole which would be forwarded to Keene. Walpole also served as a collection agent for notes. Checks from banks not located in Keene were forwarded directly to the National Shawmut Bank in Boston, Massachusetts, where they were credited to the account of Keene. Checks drawn on banks located in the municipality of Keene were sent to Keene National.

According to the testimony of Elliot Snow, the President of Keene, at the Comptroller's hearing on July 9, 1975, new accounts were opened, loans were made, collected and cancelled, and checks drawn on Keene were paid. Tr. 79–80.

Plaintiffs, quoting Attorney General Wickersham, contend that there is a "wide difference" between "the right to establish branch banks at which a general banking business is carried on" and "the mere appointment of agents to receive and collect money and forward it to the bank." 29 Ops.A.G. 81, 90.

Indeed, were I to look to the law before 1927, I might well have found that this "agency" was not a branch. *See First National Bank v. Missouri,* 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486 (1924). But, the agency is within the definition of a branch contained at 12 U.S.C. § 36(f) since 1927 when the McFadden Act was passed. That language, which defines a branch, has re-

mained the same since it was passed. The language received little judicial attention at first as it was all most banks could do to hold on to their main offices during the years of the great depression. Recently, however, with the emergence of Electronic Funds Transfer Systems and Bank Holding Companies, the amount of litigation surrounding the definition of a branch bank has become multitudinous. In light of *First National Bank in Plant City v. Dickinson*, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969), where the Supreme Court held that an armored car service which picked up deposits from businesses and a stationary off-premises receptacle for the receipt of deposits were "branches," I must find that a human being who takes deposits, opens accounts, and accepts note payments in a bank building seventeen miles away from the main office constitutes a branch bank.[3]

*Procedural Issues*

■ The third issue is whether the Comptroller followed the correct procedure in determining that the branch could be relocated and that it could offer stepped-up services. The regulations which contain the procedures to be followed for the Comptroller to reach decisions concerning the relocation of a branch are contained at 12 C.F.R. § 5 *et seq.* The Comptroller has complied with these requirements.

The plaintiffs complain that, by allowing Keene's agency to relocate, Keene has been granted authority for stepped-up services. They complain that the procedures were insufficient for the Comptroller to make this determination.

Plaintiffs have not pointed to any law which suggests that the Comptroller need follow any procedure in granting this authority; nor have I been able to find any.

In permitting grandfathered branches to remain in operation, Congress intended that they would be given authorities that other branches were given. Congress has never acted to single out these grandfathered branches by permitting them to offer only more limited services when it has authorized a general expansion of services.

The Comptroller's actions are upheld.

SO ORDERED.

Whether the activities here in question constitute branch banking under that standard seems to me an extremely close question. That being so, I would defer to the determination of the Comptroller of the Currency. He is the official charged with administering these provisions of the Act, and I cannot say his determination was not a reasonable one.

---

**3.** In overruling the Comptroller's ruling that the armored cars in question were not branches, the Court had to find that the plaintiffs sustained the heavy burden required to upset an administrative ruling. The burden here is on those who wish to deny the existence of the branch.

In dissenting, Justice Stewart mentioned the effect of this burden: