243 Pa. Superior Ct. 33 (1976)
364 A.2d 435
Clark HARRINGTON et al., Appellees,
v.
PHILADELPHIA CITY EMPLOYEES FEDERAL CREDIT UNION et al.
Appeal of PHILADELPHIA CITY EMPLOYEES FEDERAL CREDIT UNION et al.
Superior Court of Pennsylvania.
September 27, 1976.
*36 Harold L. Randolph, Philadelphia, for appellants.
Neil H. Stein, I. Raymond Kremer, Philadelphia, for appellees.
Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.
PRICE, Judge.
In March, 1972, the general membership of the Philadelphia City Employees Federal Credit Union (Union) were involved in the democratic process of electing representatives to the Board of Directors (Board) and to the Credit Committee. Following the election, several newly elected Board and Credit Committee members were denied their elected positions, and two Board members were removed from office before the expiration of their terms. These various Union members filed a suit in equity to reinstate those Board members who were removed and to install in their respective positions those who were not seated. The chancellor determined that the court of common pleas had jurisdiction, and decreed *37 that plaintiffs-appellees had been improperly denied access to their duly elected offices, or improperly removed from office. The chancellor, the Honorable Jay H. Eiseman, submitted a very excellent and comprehensive opinion. We agree with the lower court and will, therefore, affirm the Decree Nisi.
The somewhat complicated factual setting, as found in the record, indicates that in March, 1972, four of the eleven positions on the Union's Board were up for election. In addition, the general membership of the Union was to fill a one seat vacancy on the five member Credit Committee. The election was vigorously contested.
This election was highlighted by a power struggle for control of the Board and, as such, control of the Union. The principals were appellee Clark Harrington and appellant Reverend Stanley H. Scott. Harrington was a member of the Board, elected to serve until March, 1973, and was also treasurer of the Union. Scott, too, was a member of the Board. He became president of that body in 1971 and was to serve in that office for one year.
Appellee Harrington enlisted the aid of appellee Charles Mancini in his efforts to insure election of those candidates he supported. Mancini was a member of the election committee, the group charged with governing the election, as well as a candidate for one of the vacant seats on the Board. Mancini furnished Harrington with a mailing list of Union members. Harrington used the facilities of the Pilgrim Life Insurance Company to prepare approximately ten thousand items of campaign literature to be sent to Union members. Appellee Joseph Stivala helped Harrington distribute this literature.
At the regular meeting of the Board on March 16, 1972, and while the election was in progress, a resolution suspending appellee Mancini from his position on the election committee was passed. This action was ordered because of the mailing list incident. Mancini was informed, *38 on March 30, 1972, by a certified letter, that the general membership would consider his suspension at a special meeting which was being held April 9, 1972. In a further action, the Board increased its number from eleven to thirteen and appointed appellants Charles Lundy and Wayne Foster to fill the newly created seats.
The results of the election indicated that appellees Mancini, Michael J. McAllister, and Vincent P. McBride, all supported by appellee Harrington, had been elected to the Board, and that appellee Carlo R. Gambetta, another Harrington candidate, had been elected to the Credit Committee. Kay Batman, the fourth newly elected Board member, was not sympathetic to the Harrington faction.
The special general membership meeting scheduled for April 9, 1972, was called at the direction of appellant Scott. All members of the Union were advised of this meeting by letter dated March 27, 1972. However, prior to the meeting, the various appellees instituted a complaint in equity and obtained an ex parte injunction. This injunction, obtained on April 6, 1972, prevented the April 9, 1972, meeting from taking place as scheduled. There was extensive publicity attending the cancellation of the scheduled meeting: notices were posted in conspicuous places, announcements were made on the radio, and advertisements were printed in the newspaper.
The anticipated cancellation turned out to be premature. On April 8, 1972, the Supreme Court of Pennsylvania issued an order dissolving the ex parte injunction, thus permitting the meeting to take place. Unfortunately, the announcement that the meeting would convene as originally scheduled was acclaimed with somewhat less than the far reaching effect the cancellation commanded. The special meeting took place with less than four hundred of the Union's twenty-three thousand members in attendance.
*39 At this special meeting, appellee Gambetta was precluded from taking office as a member of the Credit Committee, and appellant Paul Lewis, an unsuccessful candidate for the seat on the Credit Committee, was installed in his place. Appellees McAllister, McBride, and Mancini, all compatriots of appellee Harrington, were also precluded from taking office and were supplanted by appellants Scott, Burham Smith, and Mayme Robinson. These appellants had sought election to the Board, but were unsuccessful. In addition, appellees Harrington and Stivala were removed from their positions as members of the Board and were replaced by appellants Bernard Lester and John J. Meilcarek. Both Lester and Meilcarek had also unsuccessfully campaigned for the open seats on the Board.
Harrington was ostensibly removed from office for cause. This cause consisted of using the mailing list furnished by appellee Mancini to circulate campaign literature favorable to his "slate" of candidates, of receiving a favor from the Pilgrim Life Insurance Company at a time when he, as a member of the Board, was recommending this company as insurance carrier for the Union, and of refusing to resign from the real estate committee, of which he was a member, while he was a licensed real estate broker. Stivala was also a licensed real estate broker and was apparently removed due to a potential conflict of interest. The newly elected officials were denied their positions under a theory that Harrington's campaign activities had contaminated their elections to such a degree as to render them invalid.[1]
On April 17, 1972, the supreme court entered another order vacating the order of April 8, 1972, which had dissolved the injunction, and issued instead an order granting appellants' petition for a supersedeas of the ex parte *40 injunction. Appellants filed preliminary objections to the equity complaint on April 26, 1972, and appellees filed an answer to these preliminary objections on May 17, 1972. The chancellor dismissed the preliminary objections on July 6, 1972. Appellants then attempted to transfer the case to the United States District Court for the Eastern District of Pennsylvania. On January 31, 1973, the district court remanded the matter to the Court of Common Pleas of Philadelphia. The case went to trial on February 6, 1973, and the chancellor entered his Decree Nisi on November 18, 1974.
Appellants first argue that when the supreme court granted the supersedeas, it dismissed the preliminary injunction and suspended all action in connection with the complaint in equity. They contend, therefore, that following the grant of the supersedeas, any action between the parties was properly before the appellate courts and could no longer be decided by the chancellor.
The order of the supreme court dated April 8, 1972, provides as follows:
"The ex parte preliminary injunction issued April 6, 1972, is hereby dissolved; the matter is remanded to the Court of Common Pleas of Philadelphia County for the disposition of the outstanding issues raised by the Complaint filed in the lower court by plaintiffs. Plaintiffs to be granted leave to raise objections that may be occasioned by the meetings of April 9, 1972."
This order, it is clear, remanded the matter to the court of common pleas for disposition of the issues. The only affirmative action taken by the supreme court was to dissolve the preliminary injunction.
The order of the Pennsylvania Supreme Court of April 17, 1972, provides as follows:
"AND NOW, to wit, this 17th day of April, 1972, the Order entered April 8, 1972, dissolving the Ex *41 Parte Preliminary Injunction issued April 6, 1972, is hereby vacated and in substitution thereof the Petition for Supersedeas of the Ex Parte Preliminary Injunction is granted."
This order addresses only the dissolution of the preliminary injunction from the April 8, 1972, order and the substitution of the supersedeas. It makes no reference to the remaining portion of the April 8, 1972, order.
The order of the supreme court afforded appellants exactly the relief they desired: i.e., the meeting took place as originally planned. The supersedeas dealing with the injunction has no effect on a complaint dealing with other matters, which had been remanded by the supreme court's order of April 8, 1972. Obviously this situation disposes of this argument by appellants.
Appellants next contend that the federal courts have exclusive jurisdiction over the Union and any actions involving it and so the lower court had no power to decide the issues involved. The Union derives its birth and life blood from the Federal Credit Union Act, 12 U.S.C.A. § 1751, et seq. This act delineates the duties, powers, and limitations of the Union. Although the act does not specifically provide for situations such as in the case at bar, wherein disputes arise between officers inside the Union, it does provide that:
"(a) In carrying out the purposes of this subchapter, the Administrator may 
........
(2) sue and be sued, complain and defend, in any court of law or equity, State or Federal." 12 U.S.C.A. § 1789(a)(2).
The statute also provides that if the administrator is a party to the suit, then the United States district courts will have original jurisdiction. There is no doubt that in the instant case, the above language would support a suit in either state or federal court.
*42 We also note that concurrent jurisdiction, such as that here, is by no means a new and novel concept. As the United States Supreme Court stated in Charles Dowd Box Co. v. Courtney, 368 U.S. 502, 507-08, 82 S.Ct. 519, 522, 7 L.Ed.2d 483 (1962):
"We start with the premise that nothing in the concept of our federal system prevents state courts from enforcing rights created by federal law. Concurrent jurisdiction has been a common phenomenon in our judicial history, and exclusive federal court jurisdiction over cases arising under federal law has been the exception rather than the rule."
There is nothing in the present statute making federal jurisdiction exclusive in all instances, nor is there any particular reason for so restricting jurisdiction.
In addition, the appellants have already raised the issue of jurisdiction by way of a petition to transfer the case to the district court. However, the district court remanded the matter to the Court of Common Pleas of Philadelphia County. We conclude there is no merit to appellants' jurisdictional arguments.
Appellants argue that the lower court erred in concluding that the appellees were not given proper notice of the charges against them or proper notice of the meeting scheduled for April 9, 1972, all in violation of proper due process. This argument is unconvincing.
There is no question that appellees originally had ample notice of the pendency of the April 9, 1972, special meeting. In addition, they were informed in writing that certain charges would be made against them, including alleged improper use of the mailing list and an alleged conflict of interest, and that they would be permitted to present evidence on their own behalf. In response to the notice given, appellees secured an ex parte injunction from the lower court, preventing the meeting from taking place.
*43 Extensive publicity attended the cancellation of the special meeting. However, while the cancellation was being widely announced, appellants were seeking to have the Pennsylvania Supreme Court remove the injunction and permit the meeting to convene on schedule. On April 8, 1972, upon consideration of appellants' petition, the supreme court dissolved the injunction and the special meeting took place as planned.
Due to the very limited time between the dissolution of the injunction and the appointed hour for the special meeting, virtually no public notice that the meeting would take place as scheduled was made. Certainly the whisper accompanying the reinstatement of the meeting could do little to drown out the roar which heralded the supposed cancellation. The only notice of the change was by word of mouth. The end result was that less than 400 members of the Union were present.
Due process, as is required under both the Federal Constitution and the constitution of this Commonwealth, encompasses both adequate and timely notice plus an opportunity to defend. Commonwealth ex rel. Smith v. Patterson, 409 Pa. 500, 187 A.2d 278 (1963). Under the facts presently before us, appellees were not sufficiently informed of the charges against them, nor were they afforded an adequate opportunity to defend.
Appellants next argue that the suspension of the appellees was effectuated in a proper manner consistent with the Federal Credit Union Act and the by-laws of the Union. Much of the substance of this argument was considered in the discussion of due process. We note here that the chancellor considered the charges against the appellees in depth, and concluded that the charges were either complete fabrications or were insufficient to warrant suspension. Appellants challenge this determination.
*44 We have often discussed the scope of review in equity cases: "A chancellor's findings of fact, when approved by the court en banc, have the force and effect of a jury verdict and will not be disturbed on appeal if supported by adequate evidence." Philadelphia Fresh Food Terminal Corporation v. M. Levin & Co., 239 Pa.Super. 287, 292, 361 A.2d 886, 889 (Filed March 29, 1976). Here, the chancellor's findings were reviewed and affirmed by a three judge court en banc. We find support in the record for the chancellor's adjudication and will not alter his findings.
Appellants' contention that the activities of appellees Harrington, Stivala, and Mancini corrupted the entire election process is also unpersuasive. For the reasons stated in the preceding argument, we reject this contention.
Appellants next allege that the chancellor erred when he permitted the intervention of appellees McBride and McAllister, who were not parties named in the original complaint. Appellants cite no authority in support of their allegation.
The rules governing intervention are set forth in Pa. R.C.P. Nos. 2326 to 2330. Pa.R.C.P. No. 2327 provides:
"At any time during the pendency of an action, a person not a party thereto shall be permitted to intervene therein, subject to these rules if
(1) the entry of a judgment in such action or the satisfaction of such judgment will impose any liability upon such person to indemnify in whole or in part the party against whom judgment may be entered; or
(2) such person is so situated as to be adversely affected by a distribution or other disposition of property in the custody of the court or of an officer thereof; or

*45 (3) such person could have joined as an original party in the action or could have been joined therein; or
(4) the determination of such action may affect any legally enforceable interest of such person whether or not he may be bound by a judgment in the action."
It is obvious that appellees McBride and McAllister could have intervened under Pa.R.C.P. No. 2327(3). Both could have been an original party or could have been joined in the action. Both had interests which would be drastically affected by the outcome of the equity action. Our courts have determined that the question of intervention is a matter within the sound discretion of the trial court and, in the absence of a manifest abuse of that discretion, the trial court's determination will not be interfered with on appeal. Darlington v. Reilly, 363 Pa. 72, 69 A.2d 84 (1949); Reese Appeal, 175 Pa.Super. 270, 104 A.2d 176 (1954). The chancellor determined that McBride and McAllister would be permitted to intervene. We see no abuse of discretion in this determination.
Appellants also allege as reversible error the reference made in the chancellor's opinion to the destruction of certain tape recordings made of the Board meetings. The chancellor determined that every Board meeting until at least May, 1972, was taped. However, after a discussion in chambers in which the chancellor expressed interest in the tapes, they were destroyed by one of the appellants. Appellants contend that the chancellor's comments concerning these destroyed tapes shows prejudice toward their position. We do not agree. We perceive no prejudice from the record nor will we speculate on any imagined prejudice. The evidence supporting the chancellor's conclusions was more than sufficient and we will not reverse. Herwood v. Herwood, 461 Pa. 322, 336 A.2d 306 (1975).
*46 Finally, appellants claim that the increase in the size of the Board from eleven members to thirteen members was proper. The chancellor held contra and we agree. Article seven, Section one provides that the board shall consist of eleven members, but that the number can be changed to an odd number, not less than five nor more than fifteen, by resolution of the Board. However, Article twenty-one, Section one provides that before any amendment to the by-laws is effective, the national credit union administrator[2] must give written approval of the amendment. In the instant case, no such written approval was obtained. We, therefore, conclude that the Board's action in increasing its membership from the eleven provided for in the by-laws to thirteen was not approved and so is void and of no effect.
The Decree Nisi entered November 18, 1974, is affirmed.
SPAETH, J., concurs in the result.
NOTES
[1] Kay Batman, the fourth newly elected member of the Board of Directors, was not supported by Harrington and was allowed to assume her seat.
[2] 12 U.S.C.A. § 1752a.