**Gene F. BARANY and Helen L. Elliott, Plaintiffs-Appellants,**

**v.**

**John BULLER, et al., Defendants-Appellees.**

No. 80–1458.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 21, 1980.

Decided Feb. 10, 1982.

Richard G. McCracken, Indianapolis, Ind., for plaintiffs-appellants.

Michael A. Kiefer, Garrison & Kiefer, Indianapolis, Ind., for defendants-appellees.

Before CUDAHY, Circuit Judge, FAIRCHILD, Senior Circuit Judge, and TEMPLAR,* Senior District Judge.

* The Honorable George Templar, Senior District Judge of the United States District Court for the District of Kansas, is sitting by designation.

CUDAHY, Circuit Judge.

This is an internecine dispute between removed members of the Credit Committee of a federally chartered credit union and those responsible for their removal. Although the factual setting is uncomplicated,[1] this case presents surprisingly complex legal issues concerning the availability of federal relief. Viewing the plaintiffs' action as being in the nature of a *quo warranto* proceeding to establish their rights as officers under the Federal Credit Union Act, 12 U.S.C. § 1751 *et seq.*, the district court determined that the plaintiffs' cause of action is relegated traditionally to state law. In the absence of an express private right of action of this kind under the Act, the trial court held "that Congress did not intend to create a private right of action for the enforcement of the provisions which the plaintiffs allege were violated." Consequently, the court dismissed this action for failure to state a claim. For the reasons given below, we reverse.

## I.

The plaintiffs-appellants, Gene F. Barany and Helen L. Elliott, are members of the Barbers and Beauticians Federal Credit Union ("Credit Union"), which is chartered by the National Credit Union Administration ("NCUA") under the Federal Credit Union Act, 12 U.S.C. § 1751 *et seq.* ("Act"). Pursuant to 12 U.S.C. § 1761, they were elected to the Credit Union's three-member Credit Committee.[2] The third member of the Credit Committee is defendant-appellant Richard J. Devine, who is also a loan officer and a member of the Board of Directors as well as the Credit Union's Treasurer and its only full-time paid employee. As a loan officer, Devine is authorized to approve loans and lines of credit without the concurrence of the other two Credit Committee members, or any other officer, member or employee of the Credit Union. 12 U.S.C. § 1761c, *supra* note 2.

At some time in 1979, without disclosing his actions to Barany and Elliott, Devine began approving loans to former members of the Barbers, Beauticians and Allied Industries International Association who still were engaged in either the barber or beauty trades. Upon discovering this practice, Barany and Elliott wrote to Devine and the

1. Because we are reviewing a dismissal for failure to state a claim, we accept the well-pleaded allegations of the complaint as true and view them, and the inferences reasonably to be drawn from them, in the light most favorable to plaintiffs. *Powe v. City of Chicago,* 664 F.2d 639 (7th Cir. 1981).

2. With respect to the operation and function of the Credit Committee the Act provides:

The credit committee shall hold such meetings as the business of the Federal credit union may require and not less frequently than once a month to consider applications for loans and lines of credit. Reasonable notice of such meetings shall be given to all members of the committee. Except for those loans or lines of credit required to be approved by the board of directors in section 1757(5) of this title, approval of an application shall be by a majority of the entire committee and by all members of the committee who are present at the meeting at which the application is considered; except that the credit committee may appoint one or more loan officers, and delegate to him or them the power to approve loans and lines of credit. Each loan officer shall furnish to the credit committee a record of each application approved or not approved by him within seven

days of the date of the filing of the application therefor. All applications not approved by a loan officer shall be acted upon by the credit committee. No individual shall have authority to disburse funds of the Federal credit union with respect to any loan or line of credit for which the application has been approved by him in his capacity as a loan officer. Not more than one member of the credit committee may be appointed as a loan officer. Applications for loans and lines of credit shall be made on forms prepared by such committee, which shall set forth the security, if any, and such other data as may be required. No loan may be made to any member if, upon the making of that loan, the member would be indebted to the Federal credit union upon loans made to him in an aggregated amount which would exceed 10 per centum of the credit union's unimpaired capital and surplus. For the purposes of this section an assignment of shares or the endorsement of a note shall be deemed security and, subject to such regulations as the Board may prescribe, insurance obtained under Title I of the National Housing Act shall be deemed adequate security.

12 U.S.C. § 1761c.

other defendants (the remaining members of the Credit Union's Board of Directors), notifying them that the Credit Committee no longer would approve such loans because the loan recipients were not within the Credit Union's field of membership.[3] On September 13, 1979, after a specially called Board meeting from which they were excluded, Barany and Elliott received written notification that the Board had removed them from the Credit Committee. Subsequently, the Board appointed defendant Jerry Cloud and an office employee, whose name is not mentioned in the complaint, to the vacancies on the Credit Committee left by the Board's removal of Barany and Elliott.[4]

To redress their removal from the Credit Committee, Barany and Elliott brought this action for monetary, declaratory and injunctive relief, contending that their removal by the Board of Directors was unlawful under the Act, which empowers the Supervisory Committee to take such action.[5] In essence, they argued that the removal provisions contained in § 1761d, *supra* note 5, are exclusive, divesting the Board of any power to remove Credit committee members.[6] The district court never reached the

3. Although it is not necessary to our resolution of the determinative issue presented in this appeal—whether there is a federal cause of action to redress the allegedly unlawful removal of the plaintiffs from the Credit Committee—we note Devine's explanation for the contested loans. He maintains that on September 30, 1978 the Board had approved a "once a member, always a member" resolution, permitting the issuance of loans to "former" members of the Credit Union. This resolution was passed pursuant to the Board's authority under Art. II, § 5 of the Federal Credit Union Bylaws which provides:

> The membership of members who are no longer within the field of membership on the day this bylaw is effective or thereafter, is terminated immediately: *Provided, however*, That the board may resolve that such members may retain membership if they meet certain reasonable minimum standards established by the board.

The Bylaw, in turn, was promulgated by the NCUA pursuant to its authority under 12 U.S.C. § 1758 and adopted by the Credit Union at the time of its incorporation.

In this appeal we need not decide whether Art. II, § 5 of the Bylaws is consistent with the definition of membership set forth in 12 U.S.C. § 1759 which provides: "Federal credit union membership shall be limited to groups having a common bond of occupation or association ...." However, were this question before us, we ordinarily would give great weight to an agency's interpretation of the statute which it administers, *De Avila v. Civletti*, 643 F.2d 471, 475 (7th Cir. 1981); *Laketon Asphalt Refining v. U. S. Dept. of Interior*, 624 F.2d 784, 797 (7th Cir. 1980).

4. Exhibit B appended to the complaint, indicates that Jerry Cloud replaced Elliott and that Darlene Meyer replaced Barany. Meyer is not a party in this action.

5. The members of the Supervisory Committee, only one of whom may be a director other than the treasurer, are appointed by the Board. 12 U.S.C. § 1761. With respect to the Supervisory Committee's removal of Credit Committee members, the Act provides:

> The supervisory committee ... may by unanimous vote suspend ... any member of the credit committee ... until the next members' meeting, which shall be held not less than seven nor more than fourteen days after any such suspension, at which meeting any such suspension shall be acted upon by the members ....

12 U.S.C. § 1761d.

6. With respect to the Board, the Act provides:

> The board of directors shall meet at least once a month and shall have the general direction and control of the affairs of the corporation. Minutes of all such meetings shall be kept. Among other things they shall act upon applications for membership; require any officer or employee having custody of or handling funds to give bond with good and sufficient surety in an amount and character to be determined by the board of directors in compliance with regulations prescribed from time to time by the Board, and authorize the payment of the premium or premiums therefor from the funds of the Federal credit union; fill vacancies in the board and in the credit committee until successors elected at the next annual meeting have qualified; have charge of investments other than loans to members, except that the board may designate a committee of not less than two to act as an investment committee, such investment committee to have charge of making investments under rules and procedures established by the board of directors; determine from time to time the maximum number of shares and share certificates and the classes of shares and share certificates that may be held; subject to the limitations of this chapter, determine the interest rates on loans, the security, and the maximum

merits, however, because it found that the Act did not provide Barany and Elliott with a federal cause of action to enforce their rights as members of the Credit Committee.[7]

## II.

As they did in the district court, the parties utilize the four-factor analysis articulated in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), to discern whether there is an implied private right of action of the kind asserted here under the pertinent provisions of the Act. They urge us to do the same. For the reasons given below, applying the *Cort* analysis, we find that the plaintiffs do not have an implied private right of action under the Act in this case. However, we also conclude that they may bring this action under the federal common law.

## A.

The familiar *Cort* criteria are:

amount which may be loaned or provided in lines of credit; subject to such regulations as may be issued by the Board, authorize an interest refund to members of records at the close of business on the last day of any dividend period in proportion to the interest paid by them during that dividend period; and provide for compensation of necessary clerical and auditing assistance requested by the supervisory committee, and of loan officers appointed by the credit committee. The board may appoint an executive committee of not less than three directors to exercise such authority as may be delegated to it subject to such conditions and limitations as may be prescribed by the board. Such executive committee or one or more membership officers appointed by the board from among the members of the credit union, other than the treasurer, an assistant treasurer, or a loan officer, may be authorized by the board to approve applications for membership under such conditions as the board may prescribe; except that such committee or membership officer so authorized shall submit to the board at each monthly meeting a list of approved or pending applications for membership received since the previous monthly meeting, together with such other related information as the by-laws or the board may require. If a membership application is denied, the reasons therefor shall be furnished

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," *Texas & Pacific R. Co. v. Rigsby*, 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916) (emphasis supplied)— that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? See, *e.g., National Railroad Passenger Corp. v. National Ass'n of Railroad Passengers*, 414 U.S. 453, 458, 460, 94 S.Ct. 690, 693, 694, 38 L.Ed.2d 646 (1974) (*Amtrak*). Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? See, *e.g., Amtrak, supra; Securities Investor Protection Corp. v. Barbour*, 421 U.S. 412, 423, 95 S.Ct. 1733, 1740, 44 L.Ed.2d 263 (1975); *Calhoon v. Harvey*, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964). And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a

in writing to the person whose application is denied, upon written request.
12 U.S.C. § 1761b.

Apart from providing that the Board "shall have the general direction and control of the affairs of the corporation," which arguably confers removal authority, § 1761b apparently does not explicitly authorize the Board to remove Credit Committee members. However, this is an issue which we need not resolve in the present context.

7. In their Supplemental Brief in Opposition to Motion to Dismiss, Barany and Elliott explicitly and strenuously disavowed any implication that they were seeking to enforce their rights as members of the Credit Union. They stated therein that they were suing "to vindicate their personal right, as member-officers, not to be deprived of elective office except in the manner prescribed by the [Act]." Thus, they maintained, *inter alia*, that this action is not governed by Fed.R.Civ.P. 23.1, which sets forth the requirements for shareholder derivative actions. Consequently, the trial court was not presented with the question whether an implied private right of action exists under the Act for members suing, *qua* members, to redress the unlawful removal of credit union officers. Because this question was not presented below, we do not consider it here. See *Laketon Asphalt, supra* note 3, at 788.

cause of action based solely on federal law? See *Wheeldin v. Wheeler*, 373 U.S. 647, 652, 83 S.Ct. 1441, 1445, 10 L.Ed.2d 605 (1963); cf. *J. I. Case Co. v. Borak*, 377 U.S. 426, 434, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964); *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 394–395, 91 S.Ct. 1999, 2003–2004, 29 L.Ed.2d 619 (1971); *id.*, at 400, 91 S.Ct. at 2006 (Harlan, J., concurring in judgment).

422 U.S. at 78, 95 S.Ct. at 2088.

More recently, the Court has emphasized that the determinative question in cases involving a claimed private right of action is whether Congress intended to create the particular right of action being asserted and has stated that the resolution of this question is strictly a matter of statutory interpretation. The four *Cort* factors are merely statutory interpretation aids. *E.g.*, *Touche Ross & Co. v. Reddington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). Moreover, these factors are not equally weighted. The first two are most important. If they militate against implying the asserted right of action, then the remaining two factors need not be considered. *California v. Sierra Club*, 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981); *Touche Ross*, 442 U.S. at 574–76, 99 S.Ct. at 2488–2489. Finally, in virtually every instance in which an implied private right of action has been found, the statute in question either prohibited certain conduct or created federal rights in favor of private parties. *Touche Ross*, 442 U.S. at 569, 99 S.Ct. at 2485.

Under this latter rubric, we should affirm the district court's holding that under the Act the plaintiffs do not have a private right of action of the kind asserted here. Even accepting the implicit premise upon which the plaintiffs rely (*i.e.*, that § 1761d confers upon the Supervisory Committee the exclusive power to remove members of the Credit Committee), the statutory provision in question neither explicitly prohibits the conduct of which the plaintiffs complain nor creates federal rights in their favor.

Nor under the first *Cort* test are the plaintiffs members of the "class for whose *especial* benefit the statute was enacted." 241 U.S. at 39, 36 S.Ct. at 484 (quoted in *Cort*, 422 U.S. at 78, 95 S.Ct. at 2088). If it was intended to benefit any identifiable class, § 1761d must have been designed to protect credit union members in their capacity as members. Here, the plaintiffs emphatically assert their rights only as Credit Committee members and not as members of the Credit Union generally, *supra* note 7. On appeal, they argue that their status places them at the core of the class especially benefitted by § 1761d. However, plaintiffs also are in a separate class—Credit Committee members—whose interests in this case, in which their removal from office is at issue, apparently conflict with the interests of the general membership of the Credit Union. In order words, in situations such as this there are two relevant classes: Credit Union members and Credit Committee members. These two classes overlap only because Credit Committee members also must be members of the Credit Union. However, the interests of these two classes are different and probably tend to conflict. Thus, the especial class of which the plaintiffs are members for purposes of this action is the class of Credit Committee members. This is neither the class, nor the core of the class, for whose especial benefit § 1761d was enacted. And applying the second *Cort* test, as often happens in cases of this kind, the legislative history is silent regarding Congress' intent to create the asserted private right of action. *See Cannon v. University of Chicago*, 441 U.S. 677, 694, 99 S.Ct. 1946, 1956, 60 L.Ed.2d 560 (1979). Thus, our examination of the two most important of the *Cort* factors compels the conclusion that Congress did not intend to create the private remedy asserted here.[8] Consequently,

---

8. Without elaborating its reasons, the court in *Helskala v. Johnson Space Center Federal Credit Union*, 474 F.Supp. 448, 454 (S.D. Tex. 1979), also determined that there was no implied private right of action under the Act in favor of an employee-member of a federal credit union who was discharged because of her

we agree that the district court, following a *Cort* analysis, correctly concluded that the complaint failed to state a cognizable federal claim based upon an implied statutory right of action.

### B.

But our conclusion that Congress did not intend to create a private right of action under § 1761d does not end our inquiry. As discussed more fully below, the legislative history of the Act indicates that, while Congress may not have intended to create a private right of action under the Act, neither did it intend to deny a federal remedy of the kind sought in this case. Very importantly, the history of the Act reveals that the uniform administration of federal credit unions, which can be achieved only by application of federal law, was of paramount importance to Congress when it enacted the Federal Credit Union Act. In these circumstances, we consider *sua sponte* an alternative basis for a federal remedy. *Cf. Middlesex County Sewerage Authority v. Nat'l. Sea Clammers Ass'n.*, 453 U.S. 1, ——, 101 S.Ct. 2615, 2625, 69 L.Ed.2d 435 (1981) (*sua sponte* consideration of 42 U.S.C. § 1983 as basis for private remedy after finding no implied private right of action in sources relied upon by plaintiffs). We find that federal common law provides the federal remedy which the plaintiffs seek in this case.[9]

By now it is clear that there is "no federal general common law." *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). However, in a few, limited instances, the Court has formulated specific "federal common law." *See Wheeldin v. Wheeler*, 373 U.S. 647, 651, 83 S.Ct. 1441, 1144, 10 L.Ed.2d 605 (1963). These instances "fall into two categories: those in which a federal rule of decision is 'necessary to protect uniquely federal interests,' *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 426, 84 S.Ct. 923, 939, 11 L.Ed.2d 804 (1964), and those in which Congress has given the courts the power to develop substantive law, [*Wheeldin v. Wheeler*, 373 U.S. at 652, 83 S.Ct. at 1445]." *Texas Industries*, 101 S.Ct. at 2067. If *Illinois v. City of Milwaukee*, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972) ("*Illinois I*"),[10] exemplifies the first category, the paradigm of the second is probably *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

As Justice Jackson remarked, in situations such as this in which no federal statute clearly applies the question arises

> whether in deciding the case we are bound to apply the law of some particular state or whether, to put it bluntly, we may make our own law from materials found in common law sources ....

---

criticism of certain managerial decisions, operations and procedures of the credit union.

**9.** Of course, our conclusion that the plaintiffs fail under the Act does not preclude our consideration of federal common law as a source of the federal remedy. *Cf. Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981); *Northwest Airlines v. Transport Workers Union*, 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981)(both considering federal common law as source of federal remedy, which was found not to exist under pertinent federal statutes). In both of these cases the Court refused to recognize federal common law as the source of the contribution remedy it also had found not to exist under the pertinent federal statutes. However, in both cases the asserted remedy—a right to contribution—was not provided by the common law either. 101 S.Ct. at 2063; 101 S.Ct. at 1578. Here, on the other hand, the common law does provide the asserted remedy in a *quo*

*warranto* proceeding. Also, conflicting policy arguments regarding recognition of the asserted contribution remedy were presented in *Texas Industries*. 101 S.Ct. at 2064–65. However, in this case the only question is which law— state or federal—provides the asserted remedy, not whether the remedy should exist at all. Finally, recognition of the asserted contribution remedy in both *Texas Industries* and *Northwest Airlines* may have imposed potential damage liability upon a class which previously escaped such liability. At least, it would have permitted the imposition of liability upon that class in an entirely new and different way, which might have circumvented plaintiffs' strategy decisions. No such consequences flow from our decision in this case.

**10.** The impact of *City of Milwaukee v. Illinois*, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) ("Illinois II"), is discussed in Part III.

[To say that federal courts have no general common law] is not to say that wherever we have occasion to decide a federal question which cannot be answered from federal statutes alone we may not resort to all the source materials of the common law, in that when we have fashioned an answer it does not become a part of the federal non-statutory or common law . . . .

Were we bereft of the common law, our federal system would be impotent. This follows from the recognized futility of attempting all complete statutory codes, and is apparent from the terms of the Constitution itself.

*D'Oench, Duhme & Co. v. F.D.I.C.*, 315 U.S. 447, 468–70, 62 S.Ct. 676, 684–685, 86 L.Ed. 956 (1942) (Jackson, J., concurring); *see also Clearfield Trust Co. v. United States*, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943) ("In absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards."); *Bd. of County Comm'rs of County of Jackson v. United States*, 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313 (1939) (Frankfurter, J.).

There is no contention, and circumstances do not suggest, that this case falls in the second category of "federal common law" cases in which Congress confers upon the courts the power to make substantive law.[11] Consequently, jurisdiction, if it exists at all, must be posited under 28 U.S.C. § 1331, which generally confers district court jurisdiction over actions arising under federal law. Thus, the determinative issue is whether this action arises under federal law.[12] This depends, as stated above, upon the presence of "uniquely federal interests."

We emphasize that the question presented here is not whether the plaintiffs have any remedy, but rather whether the remedy they do have is a federal one. In this regard even the defendants state:

[The plaintiffs'] grievance must be one which is relegated to the common law. There is no "special federal common law" in this area. Common law remedies properly pursued for redress of allegations by the plaintiffs are not pre-empted by federal law. There is no exclusivity of federal legislation so that a properly preserved and presented cause of action is unavailable to the Plaintiffs. The point simply is that no private right of action exists under the Federal Credit Union Act which the Plaintiffs wish to pursue.

Brief of Appellees at 21. We agree, but only insofar as defendants concede the existence of a common law remedy under these circumstances. However, we conclude that the available common law remedy must be federal.

Even without the defendants' concession on this point, we think it is clear that plaintiffs have some judicial remedy. The only reported decision involving issues similar to those presented here, which we have found, is *Harrington v. Philadelphia City Employees Federal Credit Union*, 243 Pa. Super. 33, 364 A.2d 435 (1976). It supports this conclusion that a judicial remedy is available. Moreover, the *Harrington* court also stated, in response to the defendants' argument that the federal courts had exclusive jurisdiction, that state and federal courts have concurrent jurisdiction.[13] In *Harrington*, several newly elected members of the Board of Directors and of the Credit Committee of a federal credit union, who were denied their positions, and two re-

---

**11.** However, there is a pertinent statute which arguably provides plaintiffs with administrative remedies and the possibility of judicial review. We shall consider in part III whether the Act "pre-empts" federal common law.

**12.** When this action was filed, § 1331 contained a $10,000 "amount in controversy" requirement. However, this requirement was removed, and the amended provision applies to civil actions which were pending on December 1, 1980, the date the amendments were enact-

ed. Pub.L.No. 96–486, §§ 2(a), 4, 94 Stat. 2369 (1980).

**13.** Of course, a determination that a particular right of action is a federal one does not preclude bringing an action under it in state court. It is well-settled that, in these circumstances, state courts generally must apply federal law. *Testa v. Katt*, 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947).

moved members of the Board of the same credit union sought respectively to be installed or reinstated. The Superior Court affirmed the trial court's determination that that court had jurisdiction. The Supreme Court also upheld the lower court's issuance of injunctions ordering the requested relief because the plaintiffs were afforded inadequate notice and opportunity to defend and the reasons for barring the plaintiffs from their elected positions were insufficient. 364 A.2d at 440–441.

An examination of the history of the Act reveals the "uniquely federal interests" which behoove acknowledgment of a federal remedy in this case. The first credit unions were organized in Germany in the middle of the 19th century. In 1898, the first credit union in North America was organized in Quebec, Canada. St. Mary's Bank, the plaintiff in *La Caisse Populaire Ste-Marie v. United States*, 425 F.Supp. 512 (D.N.H.1976), *aff'd*, 563 F.2d 505 (1st Cir. 1977), was the first credit union organized in the United States, receiving its charter only six days before the enactment of the first general credit union statute in this country by Massachusetts. 425 F.Supp. at 515.[14] By 1934, when the first federal credit union statute was enacted,[15] thirty-eight states had enacted credit union laws and, in 1932, Congress had passed such a statute for the District of Columbia. S.Rep.No. 555, 73d Cong., 2d Sess. 2 (1934). Under these statutes, 2,350 credit unions operated in the United States. They had 450,000 members and resources of $50,000,000, and made $65,000,000 in loans annually. *Id.*

Despite American credit unions' good record during the economic depression of the 1930's,[16] Congress perceived a need for a federal credit union statute:

At a time when industrial recovery depends on the buying power of the masses of the people, usurious money lending in total amounts which are now figured in billions of dollars annually, obviously destroys vast totals of buying power represented by the difference between what the average worker should pay for credit and what he does pay for credit. It is with this truly national problem that the [Act], is primarily concerned.

S.Rep.No. 555, *supra*, at 1.

There were several reasons supporting a federal credit union law. First, even where there were local credit union laws, in many states the laws were inadequate or the state banking department lacked interest in credit unions, thus inhibiting credit union development. Also, in the absence of a federal statute, there were no interstate credit unions. H.Rep.No. 2021, 73d Cong., 2d Sess. 2 (1934); *see also* S.Rep.No. 555, *supra*, at 4 ("The consumer-credit problem is a national problem which has no State limitations."). Consequently, one of the purposes of the 1934 Act was the establishment of federal jurisdiction over some credit unions. S.Rep.No. 555, *supra*, at 1, 4.[17] In addition to permitting the development of credit unions in those jurisdictions without a credit union statute, a federal law was thought to be necessary to insure uniform development of credit unions. S.Rep.No. 555, *supra*, at 4. These federal interests support the acknowledgment of a federal remedy in this case. Were such a remedy to be denied, the uniform development of federal credit unions will be impossible and the intended difference between state and federal credit unions will evaporate. Also, difficult choice of law problems will arise where, as here, a

---

**14.** The *La Caisse* court stated that "St. Mary's Bank is a rough translation of the French name ...." 425 F.Supp. at 515 n.1. Because the English translation was used by the *La Caisse* court, we shall use it also.

**15.** Pub.L.No. 73–467, 48 Stat. 1216 (1934).

**16.** By 1934, there had been no involuntary liquidations of credit unions. Also, although they were eligible for relief from the Reconstruction Finance Corporation, less than twelve credit

unions sought such relief. S.Rep.No. 555, *supra.*

**17.** However, the Act did not eliminate state credit unions. Rather, it merely permitted federally chartered credit unions. *See* Vol. 78, Pt. 7 Cong.Rec. 7259 (remarks of Sen. Sheppard). The Act provides for conversions from state to federal charter and *vice versa.* 12 U.S.C. § 1771.

credit union's members are from more than one state.

Legislative developments after passage of the initial federal law have increasingly federalized the governance of federal credit unions, lending further support to our conclusion. By 1970, there were 24,000 federal credit unions operating in the United States, with 22 million members and deposits of $14 billion. At that time, credit unions were the only federally chartered thrift institutions without federal insurance protection. S.Rep.No. 91–1128, 91st Cong., 2d Sess. 2 (1970); H.Rep.No. 91–1457, 91st Cong., 2d Sess., *reprinted in* [1970] U.S. Cong. Code & Ad.News 4166, 4167. Thus, in 1970 congress required the NCUA to insure federal credit unions and permitted federal insurance of credit unions not chartered under the Act. Pub.L.No. 91–468, 84 Stat. 994 (1970).

In part, the insurance provisions were viewed "as a reward for the outstanding job performed by the credit unions." [1970] U.S.Cong. Code, *supra.* But predictably, federal insurance was accompanied by provisions permitting greater federal administrative monitoring of, and intrusion into, the insured credit unions' internal affairs. *E.g.*, Pub.L.No. 91–468, *supra*, §§ 202, 204, 206(b), *codified as* 12 U.S.C. §§ 1782, 1784, 1786(b). The NCUA was given authority, *inter alia*, to terminate insurance, issue cease and desist orders, suspend and remove credit union officers, and impose monetary penalties for improper practices by a credit union or its officers. Pub.L.No. 91–468, § 206 (1970), *codified as* 12 U.S.C. § 1786. Not only did these provisions enhance the NCUA's enforcement tools, they also expanded the variety, and hence the number, of situations in which exercise of the agency's enforcement authority might occur. The analogous provisions in the original federal credit union statute had created comparatively few such situations. *See*

Pub.L.No. 73–467, June 26, 1934, ch. 750, § 16(b) (conferring upon NCUA power to suspend or revoke a credit union charter upon finding bankruptcy or violation of charter, bylaws, Act or regulations).

Additional support for our conclusion that "uniquely federal interests" require a federal common law remedy in this instance is found in courts' treatment of similar federal institutions. For example, federal credit unions are similar in important respects to federal savings and loan associations. *Cf. Nat'l Alliance of Postal & Federal Employees v. Nickerson*, 424 F.Supp. 323, 325 (D.D.C.1976) (power of NCUA analogous to that of Federal Home Loan Bank Board). The salient feature of credit unions is their democratic control and management, which are buttressed, in part, by the Act's prohibition against proxy voting and its limitation of membership to groups with a common bond. *La Caisse Populaire*, 425 F.Supp. at 517 (citing pertinent statutory provisions). Even state courts acknowledge that a federal savings and loan association "is subject only to state law which does not interfere with the purposes for which it was created, does not destroy its efficiency and does not conflict with paramount federal law." *Bruckner v. Prairie Federal Savings & Loan Ass'n*, 81 Wis.2d 215, 260 N.W.2d 256, 259 (1977) (*quoting Pearson v. First Federal Savings & Loan Ass'n*, 149 So.2d 891, 894–5 (Fla.App. 1963));[18] *see also California v. Coast Federal Savings & Loan Ass'n*, 98 F.Supp. 311, 318 (S.D.Cal.1951).

With respect to the internal administration of federal savings and loan associations, federal courts have readily formulated federal remedies not provided in the pertinent federal statute. In *Murphy v. Colonial Federal Savings & Loan Ass'n*, 388 F.2d 609 (2d Cir. 1967), a dissident group of potential directors successfully brought a federal declaratory judgment action enti-

---

**18.** In *Bruckner* the issue was whether a federal savings and loan association could have accounts payable on death, which were expressly permitted by state statute. The federal statute was silent on this issue. The court held that this was strictly a state law question: by

what means, other than by will, can property pass upon its owner's death? 260 N.W.2d at 259. Such an issue is appreciably different from the underlying issue presented here—the administration of a federally chartered institution.

tling them to inspect a list of those eligible to vote for directors in the association. The pertinent regulations permitted such votes to be cast either in person or by proxy, but neither the regulations nor the statute expressly entitled the plaintiffs to the requested inspection. Nevertheless, the court ordered the relief which was sought. Regarding the conclusion that this issue was governed by federal law, Judge Friendly stated:

> This would become readily apparent if the common law of the state where the association operated denied members a right of inspection; Congress could hardly have intended that the rights of members of federal savings and loan associations to fair elections should vary with quirks of law ....
>
> It is immaterial that the state courts also may deal with internal affairs of federal savings and loan associations.... When they do this, they are nonetheless applying federal law.

388 F.2d at 611–12.[19]

Similarly, in *Rettig v. Arlington Heights Federal Savings & Loan Ass'n*, 405 F.Supp. 819 (N.D.Ill.1975), the court denied the plaintiffs' motions to retransfer the consolidated cases to the state courts after the removal of them pursuant to 28 U.S.C. § 1441. These were actions arising out of the diversion and misappropriation of funds from several federal savings and loan associations. The court stated that the plenary powers vested in the Federal Home Loan Bank Board over the internal operations of these institutions precluded any state regulation or interference. 405 F.Supp. at 823. To the extent that federal regulations and the federal statute did not govern the matters at issue, the court determined, as we do here, that the need for uniformity in the administration of these federal institutions required the application of federal common law. 405 F.Supp. at 826–27.

Of course, where federal statutory or regulatory provisions expressly preclude a remedy which federal common law provides, the common law remedy does not continue to be available. *Kupiec v. Republic Federal Savings and Loan Ass'n*, 512 F.2d 147 (7th Cir. 1975) (Federal Home Loan Bank Board bylaw, adopted by federal savings and loan association, containing procedure by which members can communicate is exclusive). However, neither the Act nor the regulations and bylaws promulgated under it explicitly foreclose the availability of the remedies available under the common law. One such remedy was a *quo warranto* proceeding to determine one's right to an office and to ·oust the holder from its enjoyment. *See Generally* 2 Fletcher *Cyclopedia Corporations* §§ 283–296, 357, 363–367; 74 C.J.S. *Quo Warranto* § 1; 19 Am.Jur.2d Corporations § 1096. Although apparently there is no general *quo warranto* jurisdiction in the federal courts, *United States ex rel. Wisconsin v. First Federal Savings and Loan Ass'n*, 248 F.2d 804, 807–09 (7th Cir. 1957), cert. denied, 355 U.S. 957, 78 S.Ct. 543, 2 L.Ed.2d 533 (1958); *see also Ames v. Kansas*, 111 U.S. 449, 4 S.Ct. 437, 28 L.Ed. 482 (1884), we believe that the important federal interests implicated here require the limited availability of such a remedy under the federal common law of federal credit unions.

### III.

Our final inquiry is the extent to which the Act, particularly its remedial provisions, has supplanted federal common law. The Court's opinion in *Illinois* II provides the relevant analysis in this regard.[20] Essentially, we must assess the scope of the legislation and determine whether it addresses the problem governed by federal common law. Thus, federal legislation does not automatically displace federal common law. 101 S.Ct. at 1791 n.8.

**19.** In *Ochs v. Washington Heights Federal Savings & Loan Ass'n*, 17 N.Y.2d 82, 268 N.Y.S.2d 294, 215 N.E.2d 485 (1966), the New York Court of Appeals had decided that a pertinent state statute was inapplicable but that inspection was required by the common law.

**20.** The Court cursorily applied the pertinent part of *Illinois* II in *Middlesex Sewerage*, 101 S.Ct. at 2627.

In *Illinois* II the Court also explained that when determining whether federal statutory law supplants federal common law, unlike the process of determining whether federal law pre-empts state law, we must presume that federal statutory law so pre-empts. The reason for this is that Congress, and not the federal courts, has the authority to articulate the appropriate standards to be applied as a matter of federal law. 101 S.Ct. at 1792. Similarly, where a federal common law remedy is asserted and there is a pertinent federal statute with an integrated system of remedies which omits that remedy, we must presume that Congress deliberately omitted the asserted remedy. In such instances, we may not fashion new remedies that might upset the legislative scheme. *Northwest Airlines*, 101 S.Ct. at 1584.[21]

The comprehensive remedial scheme which was found to preclude federal common law remedies in *Northwest Airlines* included express provisions for private enforcement of the statute in certain carefully defined circumstances, and provisions for Government enforcement in other circumstances. 101 S.Ct. at 1581. The Court described the remedial scheme in *Texas Industries* in even more detail:

(1) violations of §§ 1 and 2 are crimes; (2) Congress has expressly authorized a private right of action for treble damages, costs, and reasonable attorneys' fees; (3) other remedial sections also provide for suits by the United States to enjoin violations or for injury to its "business or property," and *parens patriae* suits by state attorneys general; (4) Congress has provided that a final judgment or decree of an antitrust violation in one proceeding will serve as prima facie evi-

dence in any subsequent action or proceeding; and (5) the remedial provisions in the antimerger field, not at issue here, are also quite detailed.

101 S.Ct. at 2069 (footnotes omitted). Finally, the remedies provided under the 1972 amendments to the Federal Water Pollution Control Act at issue in *Illinois* II provided a forum for the pursuit of the plaintiffs' claim before expert agencies. However, the plaintiffs had chosen not to avail themselves of their statutory opportunity. 101 S.Ct. at 1797. By comparison, the statutory scheme found not to preclude federal common law remedies in *Illinois* I provided for abatement only after a "long-drawn out procedure." There was even a provision that suits for abatement had to be brought by the Attorney General on behalf of the United States at the request of the federal administrator. 406 U.S. at 103, 92 S.Ct. at 1392.

Thus, statutory remedies which do not afford aggrieved parties at least a reasonable facsimile of the relief sought under federal common law do not preclude federal common law remedies. Moreover, in all three instances discussed above in which the Court held federal common law remedies to have been precluded by the remedial scheme contained in the applicable federal statutes, the Court emphasized the comprehensive nature of the legislative scheme, which evidenced Congress' intent to bar additional remedies fashioned by the judiciary.

Defendants argue that the remedial scheme set forth in 12 U.S.C. § 1786 precludes a federal common law remedy here. Specifically, they point to provisions which authorize the NCUA: to inquire into violations of law, rules, or regulations, and un-

---

**21.** In *Texas Instruments* the Court found that federal common law did not supply a contribution remedy, there asserted by a defendant in an antitrust action. There were essentially two reasons given for the Court's conclusion in this regard, neither of which applies here. First, the Court determined that contribution among participants in a conspiracy which violated the Sherman Act did not implicate "uniquely federal interests." 101 S.Ct. at 2068. Second, the Court examined the ninety year history of the

statutory scheme, which contained numerous private and public remedies, and found no indication of Congressional intent to empower courts to alter or supplement the statutory remedies. 101 S.Ct. at 2069. As we have seen, "uniquely federal interests" are implicated here. As discussed *infra*, we find the "remedial scheme" provided in the Act to be too limited to preclude its supplementation with federal common law remedies.

sound practices, § 1786(e)(1); to issue cease and desist orders, (e)(2); to remove directors, officers or committee members, (g), (h); and to seek judicial enforcement of its orders, including the imposition of civil penalties of up to $1,000 per day, (j). The Act also provides for NCUA hearings and for judicial review under Title 5 of the United States Code, § 1786(i)(1), (i)(2).

We do not view this statutory scheme as being the kind of comprehensive scheme discussed in *Illinois* II and its recent progeny. These provisions of the Act and the regulations thereunder, 12 C.F.R. §§ 747.-302, 747.402, 747.502, authorize the NCUA to prohibit certain conduct on the part of a federal credit union or individuals associated with the credit union. On their face, however, the pertinent statutory and regulatory provisions do not empower the NCUA to give plaintiffs the most important relief they seek in this action—reinstatement and damages.[22]

Moreover, § 1786 makes no express provision for the filing of complaints by aggrieved persons. Nor is the NCUA expressly required to take any action on complaints, even assuming that they may be filed. No investigation need be undertaken, no hearings need be held, and no response to a complaint is required. Essentially then, the cited provisions authorize the NCUA to act on its own motion upon violations of the Act and to take drastic measures directly affecting the credit union but not necessarily particularly benefiting a specific complainant.[23] By way of contrast, the relief sought under federal common law in *Illinois* II was co-extensive with that provided by the statutory scheme.

Finally, as discussed in Part II B, the cited provisions were added to the Act with the federal insurance provisions. Thus, these enforcement provisions were intended to be used to safeguard the financial integrity of a credit union. Consequently, actions such as those complained of here would not warrant relief under § 1786, because they damage only the individuals affected and the democracy of the credit union, but have virtually no impact on the financial condition of the credit union itself.

The judgment of the district court is REVERSED and the case REMANDED for further proceedings consistent with this opinion.

---

**22.** It does not appear that the civil penalties provided for in the Act inure to a complaining individual's benefit.

**23.** The pertinent regulations support this view of § 1786. *See* 12 C.F.R. §§ 747.103, 747.203, 747.302, 747.303, 747.502, 747.503, 747.703, 747.704.